**Nos. 97-187C, 01-148C**
**(Judge Allegra)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC.**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

---

# HEALTH INSURANCE PLAN OF GREATER NEW YORK'S POST-TRIAL MEMORANDUM OF LAW

---

JEFFREY W. KING
**KING, PAGANO & HARRISON**
1730 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20006
(202) 371-6800
Counsel for Plaintiff Health Insurance Plan of Greater New York, Inc.

OF COUNSEL
ANDREW B. DAHLINGHAUS
**KING, PAGANO & HARRISON**
1730 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20006
(202) 371-6800

December 15, 2003

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ....................................................................................................1

I. HIP-NY PROVED THAT DEFENDANT BREACHED THE FEHB PROGRAM CONTRACT ....................................................................................2

II. HIP-NY'S ENROLLMENT DATABASE PROVIDES A REASONABLE BASIS TO CALCULATE DAMAGES ....................................................................4

A. The IPMF Data Entry Process Ensured Accurate Enrollment Data ........................6

B. The Q/Care System Also Maintained Accurate Enrollment Data .........................11

C. HIP-NY Accurately Processed The OPM Electronic Enrollment Data.................13

D. HIP-NY Conducted Additional Verifications To Ensure Accurate Federal Enrollment Data ....................................................................................13

E. Accurate Enrollment Data Were Vital To HIP-NY's Overall Successful Operations ....................................................................................14

F. HIP-NY's Enrollment Database Forms The Basis Of Its Underpayment Claim....................................................................................14

III. HIP-NY'S EXPERT WITNESS ACCURATELY CALCULATED DAMAGES...........15

A. 1988 and 1989 Enrollment Data ............................................................17

B. HIP-NY 1990-1996 HIP-NY's Enrollment Data..................................................21

IV. HIP-NY IS ENTITLED TO A CONTINGENCY RESERVE PAYMENT ......................23

V. DEFENDANT'S EXPERT TESTIMONY WAS NOT CREDIBLE ...............................25

A. Mr. Grogan's Analysis Is, At Best, Incomplete....................................................26

B. Mr. Grogan's Inconsistent Analysis Should Be Afforded No Weight ...................32

VI. MR. GROGAN'S ANALYSIS SUPPORTS HIP-NY'S CALCULATION OF THE UNDERPAYMENT.....................................................................................39

CONCLUSION....................................................................................................40

# TABLE OF AUTHORITIES

**PAGE**

**FEDERAL COURT CASES**

Aea v. Secretary of the Department of Health & Human Services, 26 Cl. Ct. 878, 881-88 (1992) ....................33, 38

A.I.G. Uruguay Compania De Seguros, S.A. v. AAA Cooper Transportation, 334 F.3d 99 (11th Cir. 2003) ....................5, 6, 15, 23

Black v. Commissioner of Internal Revenue, T.C. Memo 1977-337, 1997 Tax Ct. LEXIS 104, at **1-5 (19-20)(Sept. 27, 1977) ....................26

Brown v. United States Postal Service, 1999 U.S. App. LEXIS 22485, at *3 (Sept. 17, 1999) ....................33, 39

Central Fidelity Bank v. Denslow, 104 B.R. 761, 764 (Bankr. E.D. Va.) ....................5

City of Phoenix v. Com/Systems, Inc., 706 F.2d 1033 (9th Cir. 1983) ....................5, 23

Coffelt v. Secretary of HHS, 1992 U.S. Cl. Ct. LEXIS 285, at *20 (Feb. 24, 1992) ....................33, 38

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993) ....................15

Delco Electronics Corp. v. United States, 17 Cl. Ct. 302, 319 (1989) ....................4

In re Denslow, 104 B.R. 761, 762 (Bankr. E.D. Va.) ....................6, 15

Exxon v. United States, 45 Fed. Cl. 581, 613 (1999) ....................26

Franklin F.S.B. v. United States, 55 Fed. Cl. 108, 114 (2003) ....................23

HEM Research, Inc. v. E.I. Dupont De Nemours & Co., 1990 W.L. 7429 at *3 (E.D. Pa. 1990) ....................23

Hughes Communications Galaxy v. U.S., 47 Fed. Cl. 236, 244 (2000) ....................5

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) ....................15

Manning v. Commissioner of Internal Revenue, 1993 Tax Ct. Memo LEXIS 122 at *74 (March 30, 1993) ....................37

Norfolk So. Corp. v. Commissioner of Internal Revenue, 104 T.C. 13, 48-59 (1995) ....................26

North Slope Technical Ltd., Inc. v. United States, 14 Cl. Ct. 242, 264-65 (1988)..........................4

Pennsylvania Department of Transportation v. United States, 643 F.2d 758, 762 (Ct. Cl. 1981) ..........................2

R.P. Richards Construction Co. v. United States, 51 Fed. Cl. 116, 125 (2001) ..........................4

San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989)..........................2

Sternberger v. United States, 185 Ct. Cl. 528, 536 (1968)..........................26

Timber Investor's Inc. v. U.S., 218 Cl. Ct. 408, 421 (1978) ..........................4

Toronto, Hamilton & Buffalo Nav. Co. v. United States, 116 Ct. Cl. 184, 207 (1950)............26

UMC Electronics v. U.S., 43 Fed. Cl. 776, 799 (1999) ..........................33, 38

UnitedHealthCare Corp. v. American Trade Ins. Co., et al., 88 F.3d 563, 573-74 n.7 (8th Cir. 1996) ..........................5, 23

United States v. Bedford Associates, 548 F. Supp. 732, 743 (S.D.N.Y. 1982) ..........................26

**FEDERAL STATUTES AND REGULATIONS**

Fed. R. Evid. 803(6)..........................5

Fed. R. Evid. 702 (2003)..........................15

**OTHER**

Arthur Linton Corbin, Corbin on Contracts, Damages § 992 (1964) ..........................23

Restatement (Second) of Contracts § 344 (1981) ..........................23

Pursuant to this Court's October 31, 2003 Order, Plaintiff, Health Insurance Plan of Greater New York, Inc., ("HIP-NY"), respectfully submits this Post-Trial Memorandum Of Law in support of its claims for breach of contract against Defendant, the United States of America.

## INTRODUCTION

The only remaining dispute in this case is the amount of premiums that Defendant underpaid HIP-NY under the Federal Employees Health Benefits Program ("FEHBP"). The parties stipulated to the existence of valid contracts and that HIP-NY performed all of its obligations under those Contracts. The parties also stipulated that Defendant was obligated to pay all premiums due and to fund HIP-NY's Contingency Reserve. The analysis of Defendant's expert witness even demonstrated that the Defendant underpaid HIP-NY.

To calculate the amount of underpayments it suffered as a result of Defendant's breach, HIP-NY utilized its enrollment database. HIP-NY presented uncontested evidence that it meticulously entered and maintained its enrollment data because of the vital role those data played in HIP-NY's daily operations. Through its expert witness, Professor John Wills, HIP-NY proved that it vigorously analyzed its enrollment data to identify and confirm the amount that Defendant underpaid HIP-NY. Using that database and reports mandated by the Government from that database, HIP-NY proved that Defendant underpaid it by $12,422,651. Prof. Wills corroborated the existence of an underpayment by demonstrating that even Defendant's own payroll data revealed that Defendant underpaid HIP-NY.

Defendant's sole defense is to challenge to the reliability of HIP-NY's data based on a narrow, inconsistent and unpersuasive analysis conducted by its expert witness, Mr. Thomas Grogan. The evidence at the trial proved that Mr. Grogan refused to consider salient information, data and documents that could have corroborated the accuracy of HIP-NY's

database. Moreover, the testimony showed that Mr. Grogan constantly changed the basic premise of his analysis regarding the scope of information and documents he would be consider to corroborate or contradict the HIP-NY database. He considered any information that supported his preconceived theory that the HIP-NY data were unreliable and abandoned information if it did not support his theory. Simply stated, the analysis performed by Defendant's expert lacks the integrity and independence required by this Court.

Finally, Mr. Grogan's own flawed and incomplete analysis still showed that the amount of damages HIP-NY calculated was within both the 99% and 95% confidence intervals he calculated. Given these facts, HIP-NY has readily satisfied its burden of proof in this case.

## ARGUMENT

## I.

## HIP-NY PROVED THAT DEFENDANT BREACHED THE FEHBP CONTRACT

HIP-NY has satisfied all the elements to prove a breach of contract. In order to recover against the Defendant, HIP-NY must prove: (1) the existence of a valid contract between the parties; (2) an obligation or duty arising out of that contract; (3) a breach of that duty; and (4) damages caused by the breach. San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). As a government contractor, HIP-NY bears the burden of establishing the fundamental facts of liability, causation and resultant injury. Pennsylvania Department of Transportation v. United States, 643 F.2d 758, 762 (Ct. Cl. 1981). HIP-NY established each of these essential elements at trial.

First, the parties stipulated that: (1) there were valid Contracts during the claim period, Pretrial Stipulations at ¶¶ 28, 32, 36; and (2) that HIP-NY performed all of its obligations under

the Contracts, Pretrial Stipulations at ¶ 31.[1] Accordingly, there is no dispute that there are valid Contracts and that HIP-NY has complied with its obligations under those Contracts.

Second, the parties also stipulated to Defendant's duties that HIP-NY alleges Defendant breached in Counts I and II of the Complaint. As to Count I, the parties stipulated that Defendant is liable for all unpaid premiums that HIP-NY can demonstrate at trial. Pretrial Stipulations at ¶¶ 29, 33, 37. As to Count II, the parties further stipulated that Defendant had a duty to: (1) administer properly the Contracts, Pretrial Stipulations at ¶¶ 6, 10, 11; (2) pay timely the contractual premiums, whether or not a subscriber's contribution had been collected by the employing agency, Pretrial Stipulations at ¶¶ 6, 29, 33, 37; and (3) fund HIP-NY's Contingency Reserve, Pretrial Stipulations at ¶¶ 7-9. Accordingly, HIP-NY has fulfilled its burden to establish that Defendant had a duty to pay full premiums to HIP-NY and properly fund HIP-NY's Contingency Reserve.

Third, there is no serious dispute that Defendant breached its contractual obligation by failing to pay the full premiums due HIP-NY and to fund HIP-NY's contingency reserve. Although he did not compute an alternative underpayment, Defendant's expert conceded that his analysis confirmed that HIP-NY was underpaid for the years covered by his analysis, 1990 to 1996. Tr. at 1279/8-1280/17 (Grogan).

The only issue that remains is the amount of HIP-NY's damages. HIP-NY provided the only cogent evidence at trial. Defendant provided no alternative calculation of damage amount. It did not analyze either Government or HIP-NY data to determine an alternative damage amount. Rather, it argues only that the damage amount calculated by HIP-NY is not reliable.

---

1. Moreover, it is undisputed that HIP-NY fulfilled its obligation to reconcile its enrollment records with those of the employing agencies as required under the 1991 through 1996 Contracts. See Plaintiff's Proposed Findings of Uncontroverted Fact, filed May 11, 1998 at ¶ 21, attached hereto at HIP-NY App. 2; Defendant's Statement of Genuine Issues, filed June 11, 1998 at ¶21, attached hereto at HIP-NY App. 6.

Yet, its own analysis shows that the amount of damages calculated by HIP-NY were within the 99% and 95% confidence intervals set by Defendant's expert. Tr. at 1150/24-1151/25, 1279/8-1280/17 (Grogan). As set forth below, HIP-NY has more than satisfied its burden to provide a reliable basis for the damages it has calculated, $12,422,651.

## II.

## HIP-NY'S ENROLLMENT DATABASE PROVIDES A REASONABLE BASIS TO CALCULATE DAMAGES

HIP-NY presented ample evidence regarding the amount Defendant underpaid HIP-NY. A plaintiff in a breach of contract action must establish by a preponderance of the evidence that the damages claimed are reasonable and that they are causally connected to defendant's breach. R.P. Richards Construction Co. v. United States, 51 Fed. Cl. 116, 125 (2001); see also Timber Investor's Inc. v. U.S., 218 Cl. Ct. 408, 421 (1978) (as in other civil cases, plaintiff must prove damages by the preponderance of the evidence). A plaintiff satisfies the burden of proof where it establishes a reasonable basis for computation of its damage amount. R.P. Richards, 51 Fed. Cl. at 125. A plaintiff, however, is not required to prove the amount of damages sustained to a mathematical certainty. Id.; see also, Delco Electronics Corp. v. United States, 17 Cl. Ct. 302, 319 (1989)(plaintiff "need not prove [its] damages with absolute certainty or mathematical exactitude"). "Although a plaintiff must prove the extent of its damages so that the amount determined is more than mere speculation, there is a presumption that its actual damages are reasonable." R.P. Richards, 51 Fed. Cl. at 125 (citing North Slope Technical Ltd., Inc. v. United States, 14 Cl. Ct. 242, 264-65 (1988)).

HIP-NY proved its damages by establishing the premiums it should have been paid and comparing that amount to the payments it received. Tr. at 557/2-558/1, 583/21-584/24 (Wills). The parties stipulated to the payments received. See Pretrial Stipulations at ¶¶ 60-68. Using its

enrollment data, HIP-NY calculated the premiums due on a subscriber-by-subscriber, day-by-day basis for each federal subscriber enrolled in the HIP-NY FEHB plan during the claim period.

The enrollment data maintained by HIP-NY for subscribers in its FEHBP plan provide a more than adequate basis to compute damages. HIP-NY's enrollment database is admissible under the Federal Rules of Evidence as a business record. Federal Rule of Evidence 803(6) specifically states that a "data compilation, in any form" may be used to prove an act or event. Fed. R. Evid. 803(6)(2003); accord, Central Fidelity Bank v. Denslow, 104 B.R. 761, 764 (Bankr. E.D. Va. 1989)("Decisions are legion admitting computer records as Rule 803(6) business records.").

The Courts have consistently permitted plaintiffs to utilize electronic data, recognized as business records, in order to prove damages. City of Phoenix v. Com/Systems, Inc., 706 F.2d 1033 (9th Cir. 1983)(computer summary of data compilation admissible); see also Hughes Communications Galaxy v. U.S., 47 Fed. Cl. 236, 244 (2000)(damages calculated using internal business records). For example, the Eighth Circuit admitted computer records to determine the damages in UnitedHealthCare Corp. v. American Trade Ins. Co., et al., 88 F.3d 563, 573-74 n.7 (8th Cir. 1996). This case involved a claim to recover premiums paid to insure several health maintenance organizations that were never forwarded by the defendants to the insurers. The court admitted the downloaded records from one of defendant's computers as evidence to trace the movement of the premiums received by the defendants.

Similarly, in A.I.G. Uruguay Compania De Seguros, S.A. v. AAA Cooper Transportation, 334 F.3d 997 (11th Cir. 2003), the plaintiff, an electronics company, sued a freight carrier for damages resulting from the loss of a shipment of cellular phones. The plaintiff proved its damages through electronically maintained packing invoices showing the number of

phones shipped. Id. at 1003, 1007. The court held that the plaintiff's electronic record of the packing invoices was sufficiently direct evidence of the contents of the shipment, which could be used to calculate the damages. In so holding, the court considered that:

> When the particular phones to be packaged to fill the order are selected, their serial numbers are scanned into the Motorola system, and that record follows the order from station to station as it proceeds toward shipment. These serial numbers appear automatically on the invoice generated before the shipment leaves the facility. This record is made contemporaneously with the "sealing" of the phones inside the cartons that directly and without inference identifies the contents of that carton . . .

Id. at 1007; see also In re Denslow, 104 B.R. 761, 762 (Bankr. E.D. Va. 1989) (permitting the use of computer-stored automatic teller machine transactions to calculate damages).

Like the computer-stored data in A.I.G. Uruguay, HIP-NY's meticulously maintained enrollment data were a reliable source from which to calculate damages here. As the testimony of Valerie Reardon, Courtney Chan, Harold Miller, Elpinicki Kaitatzis and Viola Sykes demonstrated, HIP-NY entered federal enrollment data into the Insured Persons Master File ("IPMF") for the majority of the claim period, 1988 through July of 1994. Tr. at 244/23-25 (Chan); Tr. at 306/25-308/5 (Kaitatzis); Tr. at 318/7-24 (Sykes); 322/12-19, 331/5-11 (Bynum). HIP-NY continued its diligent, meticulous data entry processes throughout the claim period, and beginning in July 1994, began entering enrollment data into another database called Q/Care. Tr. at 331/5-11 (Bynum). Both IPMF and Q/Care databases were used in parallel from March 1992 to November 1995. Tr. at 91/4-93/5 (Reardon).

**A. The IPMF Data Entry Process Ensured Accurate Enrollment Data**

HIP-NY utilized a multiple step process to enter federal enrollment data into the IPMF system. The individuals who entered the federal enrollment data were experts in that process. Courtney Chan and Harold Miller, HIP-NY Data Entry Clerks, both testified that HIP-NY

employed extensive data entry measures to ensure the accuracy of the data entered into HIP-NY's enrollment database. Both witnesses testified that, immediately upon receipt of federal enrollment forms, they were covered with a transmittal sheet called an SF2811. Tr. at 245/18-246/2 (Chan); Tr. at 285/17-286/12 (Miller). These witnesses further testified that HIP-NY personnel reviewed the SF2811s to ensure all appropriate forms were attached. Tr. at 245/18-247/24 (Chan); Tr. at 286/2-12 (Miller). If a federal agency did not include forms or if the agency did not include an SF2811 with the forms, the Enrollment and Billing Department contacted the federal employing agencies to request the missing documentation. See Tr. at 262/16-263/10 (Chan). If an agency failed to provide promptly the documentation, HIP-NY sent letters to the agencies requesting the required forms or documents. Tr. at 248/22-249/10 (Chan); PX 54 (Letter to Agency, dated 12/4/91).

Once the Enrollment and Billing Department checked and verified the SF2811's, HIP-NY then reviewed the attached enrollment forms. Tr. at 245/18-246/2, 246/20-247/4 (Chan); Tr. at 286/2-12 (Miller). Messrs. Chan and Miller both testified that HIP-NY personnel entered the Social Security number of the individuals identified on federal forms to determine whether the individual had an existing or previous enrollment with HIP-NY. Tr. at 250/3-12 (Chan); Tr. at 286/13-287/2 (Miller). For example, they checked to see if individuals identified on federal forms as already enrolled in HIP-NY were, in fact, enrolled in the HIP-NY enrollment database. Tr. at 250/3-12 (Chan); Tr. at 286/13-287/2 (Miller). In instances where an enrollment form listed an individual as a new enrollee, but HIP-NY's enrollment showed that the person was already enrolled, HIP-NY personnel contacted the agencies to resolve the discrepancy. Similarly, when HIP-NY received a form terminating a federal member, but the database showed

the individual as someone already terminated, HIP-NY contacted the agency to verify the new termination date. Tr. at 110/13-21 (Reardon).

Mr. Chan testified that, after HIP-NY reviewed the forms for current enrollment status, the Enrollment and Billing Department batched the forms by transaction type, such as by new enrollments, terminations, and other changes. Tr. at 253/2-11 (Chan). The Enrollment and Billing Department then forwarded these forms to the HIP-NY Data Entry Department. Tr. at 270/6-10 (Chan); Tr. at 286/13-287/2 (Miller).

Elpinicki Kaitatzis, Supervisor, Data Entry, testified that, throughout the relevant time period, she was employed in the Data Entry Department. Tr. at 306/25-307/4 (Kaitatzis). Ms. Kaitatzis testified that, upon receipt of the federal enrollment forms, the Data Entry Department sub-divided the forms into smaller batches depending on the type of change, that is, enrollments, termination, and other types of changes. Tr. at 308/14-309/4 (Kaitatzis). This expedited the processing of enrollment information and further ensured the accuracy of the data entered. Ms. Kaitatzis also testified that her department placed a control sheet on each batch that identified the number of transactions HIP-NY had to enter into the system. Tr. at 309/11-310/7 (Kaitatzis).

Ms. Kaitatzis then testified that her department entered the enrollment data from the forms into the “Pertec” system. Tr. at 307/5-25 (Kaitatzis). Ms. Kaitatzis explained that the Pertec system held the enrollment transactions prior to uploading into the IPMF database. Tr. at 307/5-308/5 (Kaitatzis).

When HIP-NY Data Entry Clerks completed a batch of federal forms, the clerks then put he forms in a file for verification. See Tr. at 309/17-310/15 (Kaitatzis). A separate verification clerk then verified the data previously entered in each batch. Tr. at 310/8-19 (Kaitatzis). Ms. Kaitatzis explained that, in order to carry out verification, HIP-NY personnel set the computer to

"verification mode" and re-typed every piece of data from the form to ensure that each and every keystroke matched the original data entry. Tr. at 310/8-19 (Kaitatzis).

Ms. Kaitatzis testified that if the verification clerk identified a data entry error, the clerk would correct the entry. Tr. at 310/22-311/4 (Kaitatzis). Moreover, Ms. Kaitatzis explained that if a data entry clerk could not interpret a document or if an issue arose regarding what appeared to be an anomaly in the document, such as an unusual date, the clerk removed the document from the batch and returned it to the Enrollment and Billing Department for resolution. Tr. at 311/10-312/2 (Kaitatzis).

HIP-NY's Data Entry Department then compared the number of transactions on the control sheet to the computer totals to ensure that HIP-NY entered all the federal enrollment transactions. Tr. at 309/22-310/7, 312/3-9 (Kaitatzis). For example, Ms. Kaitatzis testified if a batch contained fifty terminations, Data Entry ensured that the system showed that HIP-NY entered fifty terminations for that batch number. See Tr. at 309/11-16 (Kaitatzis). The Data Entry Department then forwarded the tape containing the newly entered enrollment data to the Data Control Department for entry into the IPMF system. Tr. at 312/3-11 (Kaitatzis).

Viola Sykes from the Data Control Department testified that when Data Control received enrollment tapes, HIP-NY uploaded the tapes into the IPMF system. Tr. at 318/10-16 (Sykes). Ms. Sykes further testified that the IPMF conducted a series of data edits and checks on the enrollment information. Tr. at 318/25-319/3 (Sykes). If any of the data did not fit the parameters in the IPMF system, the system generated a discrepancy or error report. Id. Data Control then sent this report to the Enrollment and Billing Department for resolution. Tr. at 318/25-319/6 (Sykes).

Carmen Bynum, a Senior Manager of the Information Systems Department of HIP-NY, testified regarding the types of checks and edits that HIP-NY programmed into IPMF to verify data entry. Tr. at 323/3-324/11 (Bynum). Ms. Bynum testified that IPMF checked for many conditions, such as to ensure that there were no duplicate Social Security numbers entered or that birth dates fit within certain parameters. Tr. at 323/3-12, 325/6-11 (Bynum). If any data failed to meet these specific parameters, the system generated a report that Data Control forwarded to the Enrollment and Billing Department for resolution. Tr. at 324/12-325/17 (Bynum).

Ms. Bynum also indicated that the system checked whether effective dates of transactions fit within the parameters of the program. Tr. at 323/13-19 (Bynum). Ms. Bynum testified that any transactions that had a date in the future would be put on hold. Tr. at 323/23-324/2 (Bynum). The system held those data until the appropriate effective date of that enrollment or termination. Id. Ms. Bynum explained this was necessary to avoid issues relating to the payment of capitation to physicians for people who were enrolled for a future date or failing to pay capitations for people who were disenrolled on a future date. Tr. at 323/23-324/11 (Bynum). Ms. Bynum explained that the system generated a report for these future transactions that her department forwarded to the Enrollment and Billing Department. Tr. at 324/12-325/5 (Bynum). The Enrollment and Billing Department then confirmed that these future dates were, in fact, correct. Similarly, IPMF generated a report for retroactive transactions to ensure that these post-dated transactions were, in fact, correct. Tr. at 326/21-327/11 (Bynum).

In sum, the uncontested testimony at trial established that at the time IPMF was used to house enrollment data: (1) HIP-NY entered federal enrollment data only after Enrollment and Billing counted, checked and batched the federal forms; (2) the Data Entry Section tallied batches of transactions, entered the data, keystroke verified all of the data and verified the batch

tallies to ensure all data were properly entered; and (3) the IPMF systems applied a series of rigorous computer edits and checks to the enrollment data to ensure the data were accurate. HIP-NY's witnesses further testified that they resolved any discrepancies in the data with the appropriate federal agencies. Such meticulous, contemporaneous entry of data clearly supports the reliability of HIP-NY's database as a means to calculate damages.

**B. The Q/Care System Also Maintained Accurate Enrollment Data**

HIP-NY processed federal enrollment data under the Q/Care system in a manner similar to the process under the IPMF. Valerie Reardon and Harold Miller both testified that the Enrollment and Billing Department applied the same rigorous checks and edits to enrollment data received under the Q/Care system as it had with IPMF. Tr. at 104/4-108/21, 110/22-113/3 (Reardon); Tr. at 293/12-294/25 (Miller). The testimony revealed that HIP-NY continued to review the transmittal sheets, the SF2811s, to ensure that all federal agencies provided all the appropriate enrollment documents. Tr. at 93/20-94/21, 95/4-97/20 (Reardon); Tr. at 293/12-294/6 (Miller). HIP-NY likewise conducted the same review of the enrollment documents and continued to contact appropriate employing agencies to resolve discrepancies. Tr. at 109/17-110/21 (Reardon). As Ms. Reardon testified, HIP-NY batched the enrollment forms by transaction type to minimize error. Tr. at 98/24-99/14 (Reardon). HIP-NY also continued to total the transactions on the batch sheets. Tr. at 99/19-100/7 (Reardon). The only difference in the data entry process under Q/Care was that the Enrollment and Billing Department now entered the enrollment data directly into the system instead of forwarding it to the Data Entry Department. Tr. at 101/17-23 (Reardon). After HIP-NY entered the enrollment data into the Q/Care system, the system continued to print out totals of the types of transactions entered; that is, all new enrollments, cancellations, name change, changes in plan, etc. Tr. at 99/19-100/7,

115/4-116/10 (Reardon). These totals were then checked against the batch sheets to ensure all transactions in a batch were entered into the database. Id.

Upon entry, Ms. Bynum testified that the Q/Care system applied the same rigorous computer edits and reviews to the federal enrollment data that the IPMF applied. Tr. at 332/6-15 (Bynum). Specifically, the Q/Care system checked Social Security numbers, dates of birth and effective dates to ensure that the enrollment transactions were correctly entered. Tr. at 104/24-108/2 (Reardon). The Q/Care system also held any future transactions and issued reports to ensure the future dates were accurate. Tr. at 106/24-108/21 (Reardon). The Q/Care system also advised the data enrollment clerks if the dates fell outside pre-set parameters. Id. For example, the system advised the enrollment clerks if a retroactive termination appeared too dated. Tr. at 107/13-108/21 (Reardon). After verifying the date, the actual date of such a retroactive termination would be entered regardless of how far back they went. Tr. at 107/13-21 (Reardon).

The Q/Care system identified data entry issues immediately to the person entering the data and required the enrollment clerk to investigate and, if necessary, correct the data entered. Tr. at 332/16-333/3 (Bynum). By comparison, the IPMF system generated discrepancy reports that prompted the enrollment clerks to resolve any issues in the data entry. Id.

As a result, the data that HIP-NY entered in Q/Care, like its predecessor, IPMF, were exceptionally accurate. The uncontested testimony proved that under the Q/Care system, HIP-NY: (1) entered federal enrollment data only after Enrollment and Billing counted, checked and batched by the enrollment forms; (2) compared and reconciled the total amount of transactions it entered to the total in each batch; and (3) applied a series of rigorous computer edits and checks to ensure accurate data entry. The witnesses further testified that HIP-NY reported and resolved any discrepancies with the appropriate federal employing agency. Tr. at 108/3-21 (Reardon).

C. **HIP-NY Accurately Processed The OPM Electronic Enrollment Data**

Ms. Reardon also testified that HIP-NY received enrollment transactions electronically from the Office of Personnel Management ("OPM"). Tr. at 108/22-109/16 (Reardon). HIP-NY entered these data directly into the Q/Care system. As she testified, this eliminated the actual entry of the data by a Data Entry or Enrollment Clerk, but still included all the detailed computer checks and edits. Id. Moreover, both the IPMF and the Q/Care system generated discrepancy reports, just as when HIP-NY manually entered enrollment information into the systems. Id. The Enrollment and Billing Department then resolved any issues by contacting OPM. Tr. at 109/17-110/21 (Reardon).

D. **HIP-NY Conducted Additional Verifications To Ensure Accurate Federal Enrollment Data**

In addition to the foregoing quality control measures, HIP-NY took additional steps to ensure the accuracy of its federal enrollment data. As already admitted in this case, HIP-NY fulfilled all of its obligations to reconcile its enrollment records with those of federal payroll offices. Plaintiff's Proposed Findings of Uncontroverted Fact, filed May 11, 1998, at ¶21, HIP-NY App. 2; Defendant's Statement of Genuine Issues, filed June 11, 1998 at ¶21, HIP-NY App. 6; Tr. at 110/22-113/3, 117/20-118/12 (Reardon). This process ensured that both HIP-NY and the Defendant's employing agencies had the same federal employees enrolled in HIP-NY's health plan.

Ms. Reardon also testified regarding other measures that HIP-NY employed that verified the enrollment status of federal members. For example, HIP-NY sent mailings to members that included membership cards, member letters and annual reports. Tr. at 110/22-113/3 (Reardon). The mailings reminded members to contact HIP-NY directly to update and correct enrollment information. Id. As a result, HIP-NY was in regular contact with its members. This helped to

ensure that members who were not properly enrolled contacted HIP-NY to correct enrollment discrepancies. Moreover, HIP-NY provider groups and facilities also verified demographic information and enrollment data when members arrived for healthcare services. Id.

**E. Accurate Enrollment Data Were Vital To HIP-NY's Overall Successful Operations**

During the trial, several witnesses testified that accurate enrollment information was vital to administration of HIP-NY's FEHBP Plan as well as to HIP-NY's overall operations. For example, Ms. Reardon testified that HIP-NY's enrollment data have a direct correlation to costs and income. See Tr. at 114/9-115/3 (Reardon). Indeed, HIP-NY's enrollment data were used in rate development and in paying capitation. Id. Christopher Chappelear, a HIP-NY actuary, testified that even a small error in enrollment totals could result in millions of dollars in losses. Tr. at 393/21-24 (Chappelear). Mr. Chappelear explained that the two key elements in setting HIP-NY's rates were its total costs and its total enrollment. Tr. at 396/1-15 (Chappelear). In building its rates, HIP-NY essentially divided its total cost by its total membership to determine its per member per month ("PMPM") costs. Id. Mr. Chappelear testified that if HIP-NY overstated its enrollment, it resulted in understated premium rates for every one of its employer groups. Tr. at 394/11-395/25 (Chappelear). As a community rated plan, HIP-NY provides the same rate to all of its groups. Tr. at 395/20-25 (Chappelear). Overstating enrollment would result in premium payments that would not cover costs. Based on these effects, HIP-NY maintained data entry processes and verifications that ensured accurate enrollment totals.

**F. HIP-NY's Enrollment Database Forms The Basis Of Its Underpayment Claim**

HIP-NY utilized its extremely accurate enrollment database to calculate its underpayments in this case. Jay Steinberger, Director of Systems Development for Enrollment and Billing, testified that he extracted the enrollment data utilized for the claim from both the

IPMF and Q/Care systems. Tr. at 518/11-519/5 (Steinberger). These are the very same databases that HIP-NY meticulously developed and maintained in its daily operations.

HIP-NY timely and accurately entered its data. Accordingly, HIP-NY's enrollment database constitutes a reliable bases to calculate damages in this case. A.I.G. Uruguay, 334 F.3d at 1007; In re Denslow, 104 B.R. at 765.

**III.**

**HIP-NY'S EXPERT WITNESS ACCURATELY CALCULATED DAMAGES**

HIP-NY's expert witness, Prof. Wills, testified regarding the calculation of the underpayments. Prof. Wills' testimony exceeds the requirements of Federal Rule of Evidence 702 governing the admission of expert testimony. Under Rule 702, an expert must possess some "knowledge, skill, experience, training, or education" that will assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702 (2003). Moreover, an expert's testimony must "both [rest] on a reliable foundation and [must be] relevant to the task at hand." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141(1999) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)).

HIP-NY's expert witness obtained a B.S. in Business Management and Psychology from Towson State University, and in 1985, he obtained an M.B.A. in Finance from Loyola College. Prof. Wills has been a Certified Public Account since 1981. See, PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at *Curriculum Vitae* of John Wills. Prof. Wills was a worldwide partner in both Arthur Andersen, LLP and PricewaterhouseCoopers, LLP. Prof. Wills is currently a faculty member of the McDonough School of Business at Georgetown University, where he teaches accounting. Id. Prof. Wills has been qualified in the Courts as an expert on damages and lost profits in numerous cases. Id. Accordingly, HIP-NY's expert witness possesses the specialized "knowledge, skill,

experience, training, [and] education" that will assist this Court in determining whether Defendant underpaid HIP-NY and the extent to which HIP-NY was underpaid.

Prof. Wills based his opinions on reliable contemporaneously entered data directly relevant to the issues in this case. Prof. Wills testified that HIP-NY extracted the enrollment database for all federal enrollees from the IPMF and Q/Care systems. Tr. at 535/25-536/6 (Wills). He then explained how he combined the two enrollment databases to ensure complete and accurate enrollment data for every FEHBP member enrolled during the time frame relevant to this case. See 535/25-536/23 (Wills).

Prof. Wills periodically updated his analysis as new information became available. Tr. at Tr. at 535/25-536/23 (Wills). As a result, he requested and received updated HIP-NY enrollment data in 2000 Tr. at 520/11-521/25 (Steinberger). He also reviewed the sample generated by Defendant's expert. Tr. at 576/9-13; see 542/15-22 (Wills). Based on this additional information, Prof. Wills determined that there may be missing enrollment transactions in the 1988 and 1989 data. Tr. at 542/10-543/4 (Wills). As previously explained, HIP-NY initially utilized the IPMF system to maintain its data. These data were periodically archived. All the archived data may not have been recovered. In 1990, HIP-NY began implementing a new data system called Q/Care. Tr. at 91/4-92/17 (Reardon). When the Q/Care system was initiated, HIP-NY populated this system with enrollment data from IPMF for March 1, 1990 forward. Tr. at 521/1-522/8 (Steinberger). None of the data for Q/Care were archived. As a result, a complete enrollment record was available in Q/Care from March 1, 1990 through the end of the claim period, 1996. See Tr. at 519/2-521/25 (Steinberger).

As a result of his concern about missing enrollment transactions, Prof. Wills calculated the underpayments utilizing two separate sets of enrollment data. He utilized OPM Table 1

Reports for contract years 1988 and 1989. For contract years 1990 through 1996, Prof. Wills utilized HIP-NY's current HIP-NY enrollment data to calculate the underpayments. Tr. at 536/7-538/2 (Wills).

**A. <u>1988 and 1989 Enrollment Data</u>**

Prof. Wills used federal enrollment data from OPM Table 1 Reports that had been created during the 1988 and 1989 contract years. Tr. at 544/6-15 (Wills). Table 1 Reports are reports of the enrollment in the FEHBP after the end of each quarter. The reports are required to be produced by Defendant under the regulations governing the FEHBP. JX 17-340. Healthcare carriers, such as HIP-NY, provide the enrollment information on the Table 1 Reports. Specifically, HIP-NY completes federal forms identifying its enrollment as of March 31, June 30, September 30, and December 31 of each year. <u>Id.</u>; <u>see also</u> Tr. at 511/2-15 (Strassberg). The enrollments are broken down by self-only and self and family enrollment. <u>See</u> JX 15 (Table 1 Reports). The Table 1 Reports are based on HIP-NY's enrollment data.

Defendant's own witnesses testified that Defendant relies on Table 1 Reports in several aspects of its management of the FEHBP. Specifically, a health plan's FEHBP rates are subject to two periodic reviews. The rates are annually reconciled by the health plan and Defendant periodically audits the rates of each carrier under the FEHBP.

A basic premise of both the rate reconciliations and audits is to ensure that the premiums the federal government pays are a fair market rate. 48 C.F.R. § 1602.170-213(a)(1)(d); <u>see also</u> 48 C.F.R. at § 1652.216-270(b)(2). To determine whether the rates are fair, the FEHBP rates are compared to the rates of two employer groups that "have a subscriber enrollment closest to the FEHBP subscriber enrollment…." 48 C.F..R. at § 1602.170-13(a). If the FEHBP rates are "higher than the equivalent rates of the lower of the two [similarly-sized subscriber groups]

SSSGs," the health plans are required to reimburse Defendant the difference in the rates. 48 C.F.R. at § 1652.216-70(b)(4).

Defendant's own witness, Dennis Black, Associate Director of Audits, testified that participating health plans are required to use the Table 1 Reports to identify the SSSGs. Tr. at 707/20-708/6 (Black). Mr. Black testified that the SSSGs are the single most important element in auditing a plan's FEHBP rates. Tr. at 708/16-709/10 (Black). Mr. Black further verified that Defendant annually questioned hundreds of millions of dollars of rates. Tr. at 709/20-710/10 (Black). Mr. Black testified that the vast majority of the rates questioned during an audit arise from the differential between the FEHBP rates and the rates charged the SSSGs, which are identified using the Table 1 Reports. Tr. at 708/1-711/15 (Black). Ms. Nancy Kitchak, Deputy Associate Director, Center For Work Force Planning and Policy Analysis, also testified that OPM uses Table 1 Reports to identify SSSGs when auditing a plan's rates. Tr. at 872/14-873/3, 876/4-877/25 (Kitchak). Based on the testimony of Defendant's own witness, therefore, the Table 1 Reports are an accurate enough measure of Plan enrollment to be used in the reconciliation and audits of hundreds of millions of dollars in FEHBP payments.

HIP-NY's Vice-President and Chief Actuary, Leslie Strassberg, explained that the enrollment totals in the Table 1 Reports came directly from the IPMF and Q/Care databases, which the unchallenged testimony revealed to be accurate, meticulously verified and expertly maintained. Tr. at 511/4-11 (Strassberg). Mr. Strassberg also testified that the Table 1 Reports are used both by HIP-NY and OPM in the rate development and rate reconciliation process, further lending credence to their content as a means of calculating underpayments for the 1988 and 1989 contract years. Tr. at 511/19-513/8 (Strassberg).

Using the Table 1 Reports, Prof. Wills determined HIP-NY's average federal enrollment for every quarter for contract years 1988 and 1989. Tr. at 548/16-551/10 (Wills). Prof. Wills then determined the premiums due by multiplying the quarterly enrollment totals, broken down by self-only and self and family enrollments, with the applicable daily premium rates for those subscribers for each day in each quarter. Tr. at 548/16-551/10, 554/25-555/12 (Wills). Prof. Wills then compared that calculation to the stipulated amount of payments made by Defendant for 1988 and 1989. Tr. at 557/2-12 (Wills). Prof. Wills concluded with a reasonable degree of certainty that HIP-NY had been underpaid $2,816,676 for contract years 1988 and 1989. Tr. at 557/13-558/1 (Wills).

In response to the Court's questions regarding the absence of any measure to account for enrollment fluctuations during each quarter, Prof. Wills testified, on rebuttal, regarding an analysis he made regarding possible fluctuations in enrollment. Tr. at 1474/22-1475/13 (Wills). The analysis compared the enrollment every fifteen days for each year from 1990 to 1996. That analysis showed that the only significant changes in enrollment occurred during the first two weeks of January of each year, the annual open season during which FEHBP subscribers could freely change health plans. Tr. at 1472/4-1474/3 (Wills); PX 132 (Demonstrative Charts).

Prof. Wills testified that HIP-NY could account for the Open Season fluctuations by utilizing enrollment totals as of March 31 for the first quarter, rather than averaging the enrollment reported on December 31 and March 31 for the first quarter. Tr. at 474/13-21 (Wills). By weighing the first quarter this way to capture the enrollment fluctuations that occur in the beginning of the first quarter, the underpayment amount for contract years 1988 and 1989 would be approximately $2.9 million, roughly $150,000 greater than the calculated amount based on the average enrollment for each quarter. Tr. at 1474/22-1475/13 (Wills); <u>compare</u> PX

121 (Sept. 8, 2003 Rpt. of J. Wills) to PX 132 (Demonstrative Charts). Accordingly, Prof. Wills' analysis of the underpayments for 1988 and 1989 were conservative, minimizing the impact of enrollment fluctuation in the first quarter of each year.

Defendant contends that the Table 1 Report is not a reliable source of calculating damages, but provides no basis for that contention. Defendant's expert witness, Thomas Grogan, made no substantive analysis of the 1988 and 1989 calculations or the Table 1 Reports. See Tr. at 1136/3-16 (Grogan). Moreover, Defendant failed to evaluate of the accuracy of the data in the Table 1 Reports, did not provide any alternative data to that in the Table 1 Reports, and failed to raise any other issue that would affect the accuracy of the Reports.

Defendant's sole contention regarding the Table 1 Reports is that HIP-NY previously claimed that its enrollment data were inflated and inaccurate during 1988 and 1989. Defendant relies on a single document prepared in 1991 in response to an audit of HIP-NY's FEHBP rates. DX 109 (1991 Audit Report). In that response, HIP-NY expressed concern that the various employing agencies of Defendant were not reconciling their enrollment and, therefore, HIP-NY's enrollment data may have included individuals who should have been terminated. Id. Defendant's reliance on this single statement is misplaced.

First, the testimony at trial revealed that the enrollment reconciliation process did not necessarily result in a reduction in enrollment. William Mulryan, a HIP-NY Enrollment Reconciliation Clerk, testified that enrollment reconciliation often resulted in adding as many, if not more, federal subscribers than would be terminated. See Tr. at 345/5-348/6, 351/16-352/25 (Mulryan); PX 45 (Reconciliation List, dated 1/16/92, and attached forms); PX 46 (Reconciliation List, dated 7/18/95, and attached forms).

Second, the testimony of James McLaughlin, Managing Director for Billing and Medicare Reconciliation, showed that HIP-NY's fear that its enrollment may have been inflated was incorrect. Mr. McLaughlin testified that in the early 1990s, HIP-NY annually wrote off approximately three percent of its FEHBP premiums. Tr. at 373/9-376/2 (McLaughlin). He initially understood that the cause of the write-off may have been related to the failure of the employing agencies to reconcile their records, resulting in an inflated enrollment. Tr. at 374/9-19 (McLaughlin). Subsequently, however, Mr. McLaughlin was advised that HIP-NY had reconciled with almost 100 % of the employing agencies. Tr. at 373/9-376/2 (McLaughlin). Yet, HIP-NY continued to have a write-off of approximately three percent of its FEHBP premiums each year. Id. Mr. McLaughlin testified that, as a result, HIP-NY's enrollment was not inflated, but that Defendant simply underpaid the premiums due. Tr. at 374/25-376/2 (McLaughlin).

The facts proven at trial show that Defendant mandates the submission of a Table 1 Reports. Tr. at 511/2-15 (Strassberg). The Table 1 Reports are used by OPM for a variety of statistical analyses. See Tr. at 907/5-18 (Kitchak). Table 1 Reports are used, at a minimum, to identify the SSSGs, the single most important aspects in reconciling and auditing rates that annually affect hundreds of millions of dollars in premium payments. Tr. at 707/20-711/15 (Black). If the Table 1 Reports are sufficiently reliable to audit rates, they are also sufficient to calculate damages in this case.

**B. HIP-NY 1990-1996 HIP-NY's Enrollment Data**

For contract years 1990 through 1996, Prof. Wills used HIP-NY's contemporaneously maintained enrollment to calculate whether Defendant underpaid premiums. Prof. Wills verified the accuracy of the enrollment data by running them through rigorous tests and verifications. Tr.

at 570/14-572/22, 573/23-575/17 (Wills). As Prof. Wills testified, he subjected the data to numerous integrity checks to ensure all relevant data were retrieved. He ran computer programs to ensure that no one was enrolled twice. Tr. at 538/8-13, 561/2-17 (Wills). He also verified that every dependant was linked to a subscriber. Tr. at 570/17-571/10, 573/5-20 (Wills). Prof. Wills ran numerous additional tests that required HIP-NY to go back and verify data through documentation and other means. Tr. at 561/2-14 (Wills).

Prof. Wills then identified a timeline for every subscriber in the system. Tr. at 576/20-577/8 (Wills). This timeline identified every day the subscriber was enrolled in HIP-NY's federal account and the type of coverage (self only or self and family) for that subscriber, excluding all breaks in coverage. Tr. at 580/14-582/17 (Wills). Prof. Wills ensured that no one's timelines overlapped; that is, they were enrolled in two different agencies at the same time. Tr. at 561/2-562/2 (Wills).

Finally, Prof. Wills sampled the data to determine whether there were any system errors in the enrollment data. Tr. at 573/23-575/17 (Wills). Specifically, Mr. Wills randomly identified HIP-NY federal subscribers and compared their enrollment timelines against corroborative documents and data to ensure that the database had no systematic issues. Id. The comparative documents included federal forms, reconciliation documents, utilization reports, and medical records. Id. After completing this analysis, Prof. Wills determined that the database was a reliable indication of the total enrollment of HIP-NY during the time period 1990 to 1996. Tr. at 573/23-574/3 (Wills). Subsequently, Prof. Wills also analyzed the sample drawn by the Defendant and verified that the 1990 to 1996 data were reliable indicators of HIP-NY's FEHBP enrollment. Tr. at 576/9-13 (Wills).

Next, Prof. Wills calculated the premiums that were due based on the enrollment data for each subscriber. Using the enrollment timelines, Prof. Wills calculated the premiums due, subscriber-by-subscriber, day-by-day, for each and every subscriber enrolled. Tr. at 583/5-584/1 (Wills). He then compared the premiums due to the total amount of premiums paid, as stipulated by the parties. Tr. at 584/2-8 (Wills). Based upon this analysis, Prof. Wills concluded, with a reasonable degree of certainty, that Defendant underpaid HIP-NY $9,128,180 for contract years 1990 through 1996. Tr. at 584/15-24 (Wills).

HIP-NY's enrollment database is the only complete enrollment database available that identifies the federal subscribers enrolled in the HIP-NY Plan. As stated above, the Courts have repeatedly permitted litigants to calculate damages from such electronically stored data. A.I.G. Uruguay v. A.A.A. Cooper Transportation, 334 F.3d 997, 1007 (11th Cir. 2003); UnitedHealthCare Corp. v. American Trade Ins. Co., et al., 88 F.3d 563, 573-74 n.7 (8th Cir. 1996); City of Phoenix v. Com/Systems, Inc., 706 F.2d 1033 (9th Cir. 1983). Thus, HIP-NY's day-by-day, subscriber-by-subscriber damages calculation satisfies HIP-NY's burden of proof.

## IV.

## HIP-NY IS ENTITLED TO A CONTINGENCY RESERVE PAYMENT

HIP-NY is also entitled to a contingent reserve payment equivalent to four percent of the underpaid premiums. The purpose of contract damages is to place the non-breaching party in the same position he would have been in had there been no breach and to make "the non-breaching party whole." Franklin F.S.B. v. United States, 55 Fed. Cl. 108, 114 (2003) (citations omitted); accord, Arthur Linton Corbin, Corbin on Contracts, Damages § 992 (1964); Restatement (Second) of Contracts § 344 (1981); see also HEM Research, Inc. v. E.I. Dupont De Nemours & Co., 1990 W.L. 7429 at *3 (E.D. Pa. 1990). If Defendant had paid the full amount of premiums

due HIP-NY, Defendant would have likewise deposited in HIP-NY's contingency reserve account an amount equal to four percent of the underpayment.

Mr. Strassberg explained the relevance of the OPM Contingency Reserve, both operationally and as it applies to this case. Tr. at 513/9-515/12 (Strassberg). As he testified, the Contingency Reserve is funded through FEHBP premium payments, a portion of which is allocated to the Contingency Reserve fund. Tr. at 513/12-23 (Strassberg). OPM maintains the fund in the Plan's name. See Id. As Defendant's witness, Ms. Kitchak, testified, if there are sufficient funds in the Contingency Reserve, OPM proposes a lump sum payment from the Contingency Reserve to be used by HIP-NY to lower its rates. Tr. at 882/10-885/12 (Kitchak); DX 112 at p.3 (1989 Reconciliation Instructions for Community Rated Plans). The Contingency Reserve is also used during the rate negotiation process to lower the rates charged by HIP-NY. Tr. at 514/3-14, 515/3-12 (Strassberg). The lower rate benefits HIP-NY by enabling it to be more competitive. Tr. at 514/16-23 (Strassberg).

Defendant's own documents verify the purpose of the Contingency Reserve. Specifically, the 1989 Reconciliation Instructions for Community Rated Plans states that:

> Contingent reserves are maintained separately for each carrier and are increased by: (1) three percent of premiums on a continuous basis; (2) interest earned on monies held in the FEHB Fund; and (3) that portion of the one percent administrative reserve not used each year by OPM in its administration of the program.
>
> * * *
>
> Once the plan's contingent reserve exceeds its minimum preferred balance, [one month's premiums] it is our policy to return the excess to the federal government and federal employees whose money it is. We accomplish this through rate reduction negotiated with the plan. In exchange for agreeing to an offset the plan will receive a lump sum payment for the reserve equal to the bi-weekly offset time 26 pay periods times the March 31 Headcount enrollment for the year to which the offset applies. Thus the plan

> receives the net-to-carrier income it is entitled to, but a portion is forwarded in a lump sum rather than split among 26 pay periods. At the same time, its rates are slightly more attractive than would otherwise have been.

DX 112 (1989 Reconciliation Instructions for Community Rated Plans) at p. 3.

Prof. Wills calculated the Contingency Reserve as four percent of the underpayment premiums. Tr. at 586/9-18 (Wills). If the Defendant had paid full amount of premiums due HIP-NY during contract years 1988 through 1996, the Contingency Reserve would have grown by an additional four (4%) percent of that underpayment. See DX 112 (1989 Reconciliation Instructions for Community Rated Plans). The Court should require the Defendant to fund fully HIP-NY's Contingency Reserve to be used to lower rates. This will ensure that HIP-NY is made whole and placed in the position it would have been had Defendant not breached its Contracts by underpaying premiums. The total due the Contingency Reserve is $477,794. Tr. at 531/20-24 (Wills). When the Contingency Reserve payment is combined with the amounts due for 1988 through 1996, the total amount due HIP-NY is $12,422,651.00. Tr. at 531/20-532/4 (Wills).

## V.

## DEFENDANT'S EXPERT TESTIMONY WAS NOT CREDIBLE

The analysis by Defendant's expert, Mr. Grogan, was so narrow and inconsistent that it lacks a basic hallmark of expert testimony—objectivity. Mr. Grogan limited his analysis to a comparison of HIP-NY's data to selected federal enrollment forms. He ignored other federal documents, refused to consider other available government data, and simply assumed the HIP-NY data were wrong without any further investigation of any discrepancies between HIP-NY's database and the select federal forms. Moreover, he constantly changed his methodology in order to find discrepancies, and ultimately failed to apply consistently his own analysis when it

did not support his preconceived conclusions. Accordingly, this Court should reject, or at minimum substantially discount, Mr. Grogan's testimony.

## A. Mr. Grogan's Analysis Is, At Best, Incomplete

A fatal shortcoming in Defendant's expert's analysis is the limited amount of information and data he considered in assessing the accuracy of HIP-NY's database. The trier of fact is assigned the task of judging the appropriate weight that should be given to an expert witness' testimony. Toronto, Hamilton & Buffalo Nav. Co. v. United States, 116 Ct. Cl. 184, 207 (1950). It is axiomatic that where an expert's testimony is incomplete, or fails to consider all relevant variables, the weight given to the expert's testimony should be disregarded or discounted by the Court. Exxon v. United States, 45 Fed. Cl. 581, 613 (1999); United States v. Bedford Associates, 548 F. Supp. 732, 743 (S.D.N.Y. 1982); Norfolk So. Corp. v. Commissioner of Internal Revenue, 104 T.C. 13, 48-49 (1995).

For example, in Exxon v. United States, 45 Fed. Cl. 581 (1999), this Court completely discounted an expert's testimony regarding market conditions because the expert failed to consider all relevant variables in forming his opinion. The case involved the appropriate calculation of gas reserves depletion in determining the plaintiff's tax liability. The Court ruled that the plaintiff's experts failed to consider the extent to which other gas producers affected the relevant market. Id. at 103. The Court noted that "bland conclusory opinion testimony `carries its own death wound'". Id. at 102 (citing Sternberger v. United States, 185 Ct. Cl. 528, 536 (1968)), accord, Black v. Commissioner of Internal Revenue, T.C. Memo 1977-337, 1997 Tax Ct. Memo LEXIS 104, at **16-19 (19-20) (Sept. 27, 1977) (rejecting expert testimony regarding the fair market value of real estate because the expert witness neglected to consider

the value of the remaining property and whether insurance compensated the taxpayers for their loss).

Similarly, Mr. Grogan's incomplete and biased analysis should be rejected. Specifically, Defendant drew a sample of 150 subscribers from HIP-NY's database. Tr. at 1146/25-1148/11, 1225/25-1227/9 (Grogan). He combined his sample with the two samples drawn and used by Prof. Wills in his analysis of the database. Id. Mr. Grogan then compared the enrollment data in HIP-NY's database for the sampled subscribers to certain select federal forms. Id. Specifically, he considered enrollment forms, SF2809s, and termination forms, SF2810s. Tr. at 1170/15-19, 1225/17-22 (Grogan).

As if he was testing the availability of federal forms SF2809 and SF2810, not the accuracy of HIP-NY's data, Mr. Grogan refused to consider any other enrollment documents or data in his analysis. Tr. at 1170/15-1171/4, 1223/5-17, 1224/6-10 (Grogan). Mr. Grogan also never bothered to investigate further the twenty-nine instances where he identified a discrepancy between the HIP-NY's data and the federal enrollment and termination forms. Rather, he just assumed that the HIP-NY data were inaccurate, ignoring the fact that there may be other explanations or additional documentation may well have shown the subscribers enrolled in HIP-NY.

There were other government documents and databases available to Mr. Grogan that he deliberately chose to ignore. To illustrate, Mr. Grogan did not consider SF2811 forms in his analysis. Tr. at 1224/6-10, 1231/19-1232/4 (Grogan). These forms are commonly referred to as transmittal sheets and accompany the enrollment (SF2809s) and terminations (SF2810s) forms. Tr. at 93/20-94/21 (Reardon); Tr. at 245/18-246/2 (Chan); 285/17-286/12 (Miller). These transmittal forms commonly identify the subscriber and the type of enrollment action to

be taken, such as a new enrollment, termination, transfer to another agency or changing from a self-only to self and a family plan. Tr. at 93/20-97/15 (Reardon); 245/18-247/20, 246/3-247/20 (Chan); PX 33-7, PX 33-10 (SF2811). These forms are prepared by the employing agencies of Defendant and are official government forms. Yet, Mr. Grogan simply refused to consider them and never even sought to obtain copies as part of his analysis. Tr. at 1224/2-10,1225/23-24 (Grogan).

Similarly, the FEHBP enrollment reconciliation process also provides substantial documentation verifying both enrollment and changes in enrollment. The testimony at trial established that HIP-NY and the employing agencies of Defendant reconciled enrollment. See Tr. at 340/2-346/21 (Mulryan); Tr. 110/22-113/3 (Reardon). The process involved HIP-NY requesting a namelist of all the federal employees employed by an agency and enrolled in the HIP-NY plan. See e.g., PX 41 (Letter from Agency, dated 3/30/92). HIP-NY compared the agency name list against its enrollment database. Tr. at 339/15-340/17 (Mulryan); PX 41 (Reconciliation Letter from Agency, dated 3/30/92). HIP-NY sent letters to employing agencies that identified discrepancies between the agency's namelist and HIP-NY's enrollment data. Tr. at 342/15-19 (Mulryan); PX 42 (Reconciliation Letter, dated 6/17/92); PX 45 (Reconciliation Letter, dated 1/16/92); PX 46 (Reconciliation Letter, dated 7/18/95). The parties would resolve enrollment discrepancies utilizing this process.

Payroll offices and agencies often returned HIP-NY's letters annotated with explanations regarding each discrepancy. PX 45 (Reconciliation Letter, dated 1/16/92). At other times, agencies sent back a letter on their own letterhead identifying how to treat each discrepancy. PX 50 (Reconciliation Letter, dated 5/30/96). In each circumstance, HIP-NY took appropriate action pursuant to this reconciliation process, whether or not the Payroll

Offices and agencies ever forwarded the actual enrollment or disenrollment forms supporting the requested change. See Tr. at 357/2-11 (Mulryan).

Defendant's own officials testified that these reconciliation letters are the equivalent of federal forms and are an appropriate means of changing enrollment. PX 118 (J. Fritz Dep. at 128/8-129/18). Mr. Grogan, however, flatly refused to consider any reconciliation documents. Tr. at 1232/5-10 (Grogan).

Mr. Grogan also failed to review, much less consider, any other databases available from the employing government agencies. Specifically, each agency maintained various databases available showing an employee's enrollment in a health plan. Several witnesses testified regarding the availability of FEHBP data maintained by the employing agencies. Tr. at 953/6-954/18 (Mims); Tr. 960/17-962/24, 963/10-15, 963/20-964/15 (Meyler); PX 117 (Root Dep. at 26/20-27/10); PX 116 (Rembish Dep. at 63/18-64/21, 104/2-105/5, 118/5-18). Mr. Grogan was aware that various agencies maintained data files from which FEHBP enrollment could be extracted and analyzed. Tr. at 1239/17-1240/4 (Grogan). Yet, Mr. Grogan chose not to analyze these databases to determine whether they corroborated enrollment data in HIP-NY's database. Tr. at 1237/22-1240/4 (Grogan). In fact, Mr. Grogan incredulously argued that two databases separately created from the same transaction showing the same data did **not** corroborate the accuracy of the data in either database. Tr. at 1239/5-11 (Grogan). Defendant's other witnesses disputed this contention, testifying that the enrollment of a subscriber in both an employing agency's and HIP-NY's database is proof of the accuracy of the data in both databases. See Tr. at 915/8-916/15 (Kitchak).

A review of alternative documents and data would not have imposed a significant burden on Mr. Grogan. In his entire analysis, Mr. Grogan found only twenty-nine discrepancies in the

enrollment data. Tr. at 1243/25-1244/4 (Grogan). A number of the subscribers that had discrepancies were employed by the same agencies. Accordingly, he could have sought additional documentation and government enrollment data for only twenty-nine subscribers from a dozen or so agencies or payroll offices. The failure to consider this relevant and available information and documents renders Mr. Grogan's analysis useless.

The fact that Mr. Grogan limited his analysis to SF2809s and SF2810s is especially troubling considering the fact that many enrollment transactions are not documented on the two standard forms, SF2809s and SF2810s. The witnesses for both Defendant and HIP-NY testified that enrollment transactions were carried out over the telephone at times and through the reconciliation process. Tr. at 356/1-20 (Mulryan); PX 51 (Letter to Agency, dated 4/17/95); PX 118 (Fritz Dep. at 249/21-251/9). Moreover, some transactions, most notably for OPM, were carried out through electronic transactions. Tr. at 108/22-109/16 (Reardon). In many of these events, no SF2809s or SF2810s were ever prepared. Accordingly, Mr. Grogan's analysis simply failed to consider alternative documentation that was used to effectuate enrollment changes.

Perhaps most significantly, Mr. Grogan admittedly did not locate all the applicable SF2809s and SF2810s forms for the sampled subscribers. Tr. at 1257/24-1258/10 (Grogan). He further admitted that he could not certify that all of the applicable SF2809s and SF2810s had been found for the twenty-nine discrepancies that he had identified in his analysis. Tr. at 1257/24-1258/4 (Grogan). Yet, Mr. Grogan made no attempt to obtain the additional documents or available data to determine whether the discrepancy reflected an error in HIP-NY's database or an incomplete set of documents. As demonstrated by Prof. Wills, finding documents to eliminate even a few discrepancies would have substantially altered Mr. Grogan's statistical analysis. PX 131 (Chart Illustrating Midpoint); Tr. at 1463/15-1465/22 (Wills).

The potential for a document to eliminate a discrepancy is not idle speculation. The witnesses testified that it was not uncommon to receive a document terminating a member's enrollment and a few days to a few weeks later receiving another document reinstating that member. Tr. at 266/21-267/24 (Chan). So common was it to receive documents voiding earlier terminations, that the witnesses testified that it happened "on a daily basis" during the open season enrollment period, the period when the vast majority of enrollment changes took place. Tr. at 291/23-293/11 (Miller); see, Tr. at 268/2-6 (Chan); also compare PX 109 (SF2809 for D. Pasquale) to PX 110 (SF2809 for D. Pasquale).

In fact, this occurred for several of the discrepancies identified by Mr. Grogan in his Expert Witness Report. Specifically, Mr. Grogan claimed that the federal forms he reviewed showed that. Kenneth Iadarola had terminated his enrollment in HIP-NY and enrolled in U.S. Healthcare effective January 1, 1995. DX 37 (Mar. 28, 2003 Rpt. of T. Grogan) at Appendix 12, Appendix 14. The HIP-NY data had Mr. Iadarola enrolled through the end of 1996. Subsequently, additional documents were produced as trial exhibits which reversed that transaction, re-enrolling Mr. Iadarola in HIP-NY. DX 89 (SF2810 for K. Iadarola); see also Tr. at 1257/9-1261/19, 1264/10-1265/25 (Grogan). Mr. Grogan was forced to acknowledge that this was no longer a discrepancy based upon the documentation reversing the initial transaction. Tr. at 1259/15-1261/19 (Grogan); see also Tr. at 1274/10-18 (regarding M. Jacquez), 1274/19-1275/7 (regarding H. Byrd) (Grogan). Mr. Grogan even acknowledged that "there is a potential that if other forms were found, they might . . . eliminate other errors that are identified . . .." Tr. at 1262/7-14 (Grogan).

Notwithstanding that Mr. Grogan was aware that he may not have obtained all of the applicable SF2809s and SF2810s, he made no attempt to ensure that a thorough search had been

conducted to locate all the applicable documents. Specifically, Mr. Grogan acknowledged that he obtained the SF2809s and SF2810s at issue from each subscriber's Official Personnel Folders ("OPFs"). Tr. at 1254/12-15 (Grogan). Mr. Grogan, however, never personally bothered to review the OPFs, even for the mere twenty-nine discrepancies on which he based his entire analysis. See Tr. at 1255/17-1256/18, 1257/13-17 (Grogan).

Mr. Grogan subsequently discovered that the SF2809s and SF2810s he was originally given out of the OPFs were not complete. Tr. at 1257/13-1258/10 (Grogan). Defendant submitted as trial exhibits SF2809s and SF2810s out of the OPFs for the twenty-nine subscribers Mr. Grogan identified as having discrepancies (DX 73 through 101). Those exhibits, however, contained additional SF2809s and SF2810s. Mr. Grogan was alerted to the fact that there was a potential that additional forms may exist in the OPFs. Tr. at 1257/24-1258/10 (Grogan). Yet, once again, he never bothered to review or have anyone on his staff review those twenty-nine OPFs. Tr. 1257/13-17 (Grogan).

Mr. Grogan did nothing to ensure that the twenty-nine discrepancies upon which he based his entire analysis, in fact, reflected errors in HIP-NY's database. Without investigating further or checking any additional information or data, he simply concluded that the HIP-NY database was in error. At best, Mr. Grogan's analysis is incomplete. The identity of a discrepancy should have begun an inquiry, not ended it. As a result, Mr. Grogan's analysis is fatally flawed and should be rejected by the Court.

**B. Mr. Grogan's Inconsistent Analysis Should Be Afforded No Weight**

A review of Mr. Grogan's expert reports and testimony reveals serious inconsistencies that taint his analysis and render it unreliable. Both this Court and the Federal Circuit have held that where an expert witness' testimony is internally inconsistent it should be disregarded

or discounted. UMC Electronics v. U.S., 43 Fed. Cl. 776, 799 (1999)(expert's inconsistent statements at trial, diminished the weight of his testimony.); Aea v. Secretary of the Department of Health & Human Services, 26 Cl. Ct. 878, 881-83 (1992), aff'd, 1993 U.S. App. LEXIS 23947 at *4 (Fed. Cir. Sept. 16, 1993)(upholding Special Master's rejection of expert witness' opinion on the grounds that it was internally inconsistent); see e.g., Coffelt v. Secretary of HHS, 1992 U.S. Cl. Ct. LEXIS 285, at *20 (Feb. 24, 1992)(rejecting testimony of witness where witness testimony regarding onset of health problems was inconsistent); see also, Brown v. United States Postal Service, 1999 U.S. App. LEXIS 22485, at *3 (Fed. Cir. Sept. 17, 1999)(upholding administrative judge's rejection of a witness' testimony regarding employee responsibilities due the fact the witness made inconsistent statements on the same matters at trial.).

For example, in Aea v Secretary of the Department of Health & Human Services, 26 Cl. Ct. 878 (1992), the plaintiff sued to recover under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"). In his first report, the plaintiff's expert did not ascribe an injury to either the first or second of five DPT shots administered on the child. The expert indicated that the child's injuries occurred after the third shot, which was aggravated by the fourth. Id. at *8. At trial, in direct conflict with his report, the plaintiff's expert testified that the injury occurred after the first inoculation. Later, during the same hearing, the plaintiff's expert changed his testimony, and stated that the child's injuries were not caused by the first inoculation, but instead were reactions to cold medication administered to the child. Id. at *9. This Court upheld the Special Master's rejection of the plaintiff's expert witness' expert testimony because it was inconsistent. Id. at **9-12.

In the instant case, Mr. Grogan's expert reports and trial testimony reveal a plethora of examples by which Mr. Grogan changed the very basic premise of his analysis—what "source documents" were authoritative. Tr. at 1235/4-9 (Grogan). Mr. Grogan's basic premise was that he would compare HIP-NY's enrollment data to select federal enrollment forms. He assumed any difference between the federal forms and HIP-NY's enrollment data indicated an error in the data. DX 34 (May 28, 2002 Rpt. of T. Grogan) at p. 3. Mr. Grogan expanded his definition of federal enrollment forms to include select portions of the current OPM database for retirees and annuitants. He relied upon "screen prints" from the OPM annuitant data files. Id. at p. 6; DX 71 OPM (Screen Prints). These two sources apparently, however, did not yield enough discrepancies to support his preconceived theory that HIP-NY enrollment data were not reliable.

As a result, he again expanded what he considered authoritative enrollment forms to an on-line commercial database called "Ancestory.com." DX 37 (Mar. 28, 2003 Rpt. of T. Grogan) Appendix 14 (Ancestory.com. document for L. Rodriquez)); Tr. at 1287/16-1288/11, 1289/12-1290/11 (Grogan); PX 128 (Ancestory.com.). Under Mr. Grogan's analysis, the commercial on-line database, Ancestory.com. was a more reliable source of enrollment data than government forms SF2811s, government correspondence and reconciliation lists, and other government agency databases. Mr. Grogan maintained his opinion that OPM screen prints and Ancestory.com were reliable sources of enrollment data, despite the fact that the screen prints were in direct conflict with Ancestory.com. Tr. at 1289/12-1290/2 (Grogan).

This expanded definition of enrollment documents was maintained by Mr. Grogan right up through the submission of his final Expert Witness Report a week before trial, on September 8, 2003. See DX 34 through DX 37 (Rpts. of T. Grogan). A number of the discrepancies he identified were based upon these OPM screen prints or Ancestory.com. DX 37 (Mar. 28, 2003

Rpt. of T. Grogan) at Appendix 14, (Ancestory.com. documents for L. Rodriguez); PX 128 (Ancestory.com. document for H. Schwartz); Tr. at 1289/8-16 (Grogan).

At trial, Mr. Grogan tried to revise his methodology again. On May 16, 2003, Defendant submitted as trial exhibits portions of the OPFs for the twenty-nine subscribers for which OPM claimed HIP-NY had erroneous enrollment data. Additional documents were in those OPFs that had not been produced during discovery and had never been included in Mr. Grogan's earlier reports. In fact, Mr. Grogan admitted he had not seen these documents until they had been produced as trial exhibits in May 2003, and had not "reviewed them in detail" until two weeks prior to trial. Tr. at 1252/24-1253/4 (Grogan).

These additional documents contradicted information contained in the OPM screen prints and Ancestory.com. For example, the OPM screen print for Mr. Iadarola showed that he terminated from HIP-NY on January 1, 1995. DX 37 (Mar. 28, 2003 Rpt of T. Grogan) at Appendix 14, KPMG 00440. Mr. Iadarola's OPF, however, contained additional documentation that showed the OPM had mistakenly transferred him from HIP-NY's health plan to U.S. Healthcare. DX 89 (SF2810 for K. Iadarola). The documentation showed that the earlier transaction had been voided and Mr. Iadarola had been re-enrolled in HIP-NY. DX 89 (SF2810 for K. Iadarola); Tr. at 1257/9-1261/19, 1264/10-1265/25 (Grogan).

As a result, the OPM screen-prints that Mr. Grogan claimed to be authoritative federal enrollment forms were in conflict with the SF2809, SF2810 and HIP-NY's database. Mr. Grogan had to abandon his earlier contention that the screen prints were without error and as reliable as a federal form, except when it supported his conclusion. Tr. at 1250/15-24 (Grogan).

Similarly, Mr. Grogan was forced to reverse his reliance on Ancestory.com. Before trial, Mr. Grogan claimed that the HIP-NY data contained two discrepancies regarding Mr. Theodore

Schwartz. First, he alleged that Mr. Schwartz enrollment should have terminated on October 1, 1995. DX 37 (Mar. 28, 2003 Rpt. of T. Grogan) at Appendix 12, p. 2, Appendix 14 at KPMG 00758. He based this contention on an OPM screen print. Id. Mr. Grogan also claimed that Mr. Schwartz was improperly enrolled under a family plan. Tr. at 1289/12-23 (Grogan); PX 128 (Ancestory.com). Mr. Grogan contended that Mr. Schwartz's wife had died in 1979, pursuant to data he had obtained on Ancestory.com. Id. Mr. Grogan concluded that Mr. Schwartz should have been enrolled as a self-only during the entire claim period. Tr. at 1289/17-23 (Grogan).

Notably, the OPM screen prints conflicted with Ancestory.com., showing Mr. Schwartz enrolled in a self and family plan through 1995. DX 37 (Mar. 28, 2003 Rpt. of T. Grogan) at Appendix 14, KPMG 00758. Moreover, the applicable federal forms, an SF2809, also showed he was enrolled under a self and family plan. DX 100 (SF2810 for T. Schwartz). Accordingly, Mr. Grogan relied on the screen prints to identify one discrepancy (disenrollment in 1995), but ignored that screen print and federal form to claim another discrepancy (enrollment in a self and family plan). Tr. at 1289/12-1290/11 (Grogan).

HIP-NY's counsel subsequently found a marriage certificate showing Mr. Schwartz remarried and was correctly enrolled in a self and family plan. Mr. Grogan was, therefore, forced to abandon his reliance on Ancestory.com. See 1287/16-1291/5 (Grogan). When Ancestory.com. proved an unreliable source, Mr. Grogan tried to go back to the screen prints—for at least Mr. Schwartz—to prove an error regarding disenrollment form HIP-NY's health plan. Tr. at 1290/23-1293/1 (Grogan). Yet, Mr. Grogan had earlier claimed to abandon use of the screen prints. Tr. at 1292/16-1293/1 (Grogan).

By the time Mr. Grogan took the stand, he knew his analysis was no longer correct because of the additional documents from the OPFs that were submitted as Defendant's trial

exhibits on May 16, 2003. See Tr. at 1252/17-1253/4 (Grogan). Nonetheless, he presented a PowerPoint presentation and lectured the courtroom for thirty uninterrupted pages of testimony regarding an analysis and a statistical calculation that he knew to be false. His PowerPoint presentation and initial testimony are all based upon his final expert witness report submitted on September 8, 2003.

At no time prior to or during his lengthy presentation did Mr. Grogan explain that the statistics and analysis was no longer accurate. Rather, after presenting all of the data from that report, he tried to modify his analysis on the stand. Tr. at 1157/17-1158/5 (Grogan). In prior cases, such deceitful tactics have proved fatal to the weight provided expert testimony. Manning v. Commissioner of Internal Revenue, 1993 Tax Ct. Memo LEXIS 122 at *74 (March 30, 1993)(rejecting testimony where cross-examination revealed that witness was less than truthful regarding ownership of property.).

As a result, Mr. Grogan revised his methodology yet again. Mr. Grogan finally relied on only SF2809s and SF2810s in evaluating HIP-NY's enrollment data. Tr. at 1233/16-24. He contended that the SF2809s and SF2810s were always correct and the HIP-NY database was in error if a discrepancy arose. Tr. at 1245/24-1246/4 (Grogan).

Yet, Mr. Grogan abandoned that very premise when the documents did not support his contention. For example, Mr. Grogan testified that Samuel Jones was enrolled in single coverage, despite the fact that several SF2809s and SF 2810s had Mr. Jones enrolled as a self and family subscriber. Tr. at 1325/4-1326/9 (Grogan); PX 129 (SF2810 for Mr. Jones). He based this contention on his interpretation that Mr. Jones's dependent, a child, was too old to be covered by the plan. Tr. at 1325/4-1326/22 (Grogan). In this instance, Mr. Grogan abandoned

his reliance on SF 2809s and SF 2810s and testified the federal forms were incorrect. Tr. at 1323/18-1327/24 (Grogan); PX 129 (federal enrollment forms for Mr. Jones).

Similarly, Mr. Grogan ignored the SF 2810 for another enrollee, Allen Cook. The form indicated that Mr. Cook died and his coverage terminated April 30, 1994, with coverage to be extended for thirty-one days after the effective date, that is, to May 31, 1994. DX 82 (SF2810 for Allen Cook). HIP-NY extended the coverage one month as directed on the form. DX 37 (Mar. 28, 2003 Rpt. of T. Grogan) at Appendix 14 (Cook enrollment timeline). At trial, Mr. Grogan admitted that the thirty-one day extension should be applied. Tr. at 1317/4-1318/3 (Grogan). In his report, however, Mr. Grogan considered the thirty-one days extension to be an error because Mr. Cook had died, ignoring the clear instructions on the form. DX 37 (Mar. 28, 2003 Rpt of T. Grogan) at Appendix 12.

The motives behind Mr. Grogan's departure from his methodology are obvious. Had Mr. Grogan included Mr. Jones as a family enrollee and found no error for Mr. Cook's extended coverage, his statistical analysis would have yielded drastically more favorable results for HIP-NY.

The inconsistencies above illustrate Mr. Grogan's lack of value as an expert. Mr. Grogan's primary goal was not to assist this Court in determining the amount HIP-NY was underpaid. Rather, Mr. Grogan used whatever document he had at his disposal to support his preconceived theory that HIP-NY's data were not reliable. This Court should reject Mr. Grogan's testimony as a result of these multiple inconsistencies. See UMC Electronics v. U.S., 43 Fed. Cl. 776, 799 (1999); Aea v. Secretary of the Department of Health & Human Services, 26 Cl. Ct. 878, 881-883 (1992); Coffelt v. Secretary of HHS, 1992 U.S. Cl. Ct. LEXIS 285, at

*20 (Feb. 24, 1992); Brown v. United States Postal Service, 1999 U.S. App. LEXIS 22485, at *3 (Fed. Cir. Sept. 17, 1999).

## VI.

## MR. GROGAN'S ANALYSIS SUPPORTS HIP-NY'S CALCULATION OF THE UNDERPAYMENT

While HIP-NY expended great resource and effort to calculate accurately its damages in this case, neither Defendant nor its expert have ever attempted to determine how much HIP-NY was underpaid. Yet, even Defendant's very narrow and flawed analysis shows that the damages calculated by HIP-NY were within the confidence range calculated by Mr. Grogan.

At trial, Mr. Grogan admitted during his cross-examination that HIP-NY's calculation of the underpayment for contract years 1990 through 1996 of $9,128,180 fell within $3.1 to $9.4 million range based on 95% statistical confidence intervals. Tr. at 1280/7-17, 1279/12-23 (Grogan). As a result, Mr. Grogan's analysis not only corroborates the existence of an underpayment for contract years 1990 through 1996, but it actually supported that Mr. Wills' calculation fell within the 95% and 99% confidence ranges calculated by Mr. Grogan. Tr. at 1151/9-14, 1280/7-12. (Grogan).

Finally, Mr. Grogan made no analysis of the 1988 or 1989 calculations. Tr. at 1136/15-21. Nor did Mr. Grogan make any analysis of the payroll data from OPM and USPS that Mr. Wills assessed. Tr. at 1318/14-1319/2 (Grogan). Those data confirmed a substantial underpayment by both agencies based on their own payroll data.

Accordingly, Defendant's analysis, as flawed and incomplete as it is, confirms that Defendant has underpaid premiums. Mr. Grogan's analysis confirms that the underpayments calculated by Mr. Wills from 1990 through 1996 fall within 95% and 99% confidence ranges. Moreover, Defendant provided no alternative calculations. Notwithstanding the fact that

Defendant, had its own data available. Defendant provided not a single bit of rebuttal evidence regarding the fact that their own payroll data showed consistent and perpetual underpayments.

## CONCLUSION

Based on the evidence provided at trial, judgment should be entered awarding HIP-NY $11,944,857 in unpaid health benefit premiums for contract years 1988 through 1996, an additional $477,794, which represents the amount of money Defendant should have deposited into the Contingency Reserve contemporaneous with the premium payments to HIP-NY, and statutory interest on HIP-NY's damages from the date it filed its claims until the date judgment is paid.

Respectfully submitted,

Dated: December 15, 2003

/s/

Jeffrey W. King
KING, PAGANO & HARRISON
1730 Pennsylvania Ave, N.W., Suite 900
Washington, DC 20006
(202) 371-6800
(202) 371-6770 (fax)

OF COUNSEL
Andrew B. Dahlinghaus

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 15th day of December, 2003, I caused a copy of the foregoing HEALTH INSURANCE PLAN OF GREATER NEW YORK'S POST-TRIAL MEMORANDUM OF LAW to be delivered via electronic mail to the following individual:

John Kosloske, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W, 8th Floor
Washington, D.C. 20530

Counsel for Plaintiff

/s/
Andrew B. Dahlinghaus

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

| | |
|---|---|
| HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | Civil Action No. 97-187C (Judge Merow) |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(d)(1) of the Rules for the United States Court of Federal Claims, Plaintiff, Health Insurance Plan of Greater New York ("HIP-NY"), respectfully submits its Proposed Findings Of Uncontroverted Fact in support of its Cross-Motion for Partial Summary Judgment:[1]

**A. The Federal Employees Health Benefits Program**

1. The Federal Employees Health Benefits Program ("FEHB Program") is the program through which federal employees, retirees, annuitants and their dependents and beneficiaries obtain health care benefits and services as part of their federal employment.[2]

---

1 The abbreviated citation forms used in this memorandum are as follows: (1) "Complaint/Answer at ____" refers to those paragraphs of the Complaint filed on March 24, 1997 that Defendant has admitted in whole or in part in its Answer dated June 30, 1997; (2) "Complaint at _____" refers to those portions of the Complaint that Defendant did not deny but contends are questions of law; (3) "Def. Motion" refers to "Defendant's Motion to Dismiss in Part or, in the Alternative, for Partial Summary Judgment" dated April 10, 1998; (4) "Dep. ______ at ____/____" refers to depositions of Defendant's officials taken in other cases, along with the page number and line number being cited; (5) "Decl. ____" refers to declarations in Plaintiff's Appendix; (6) "Ex. ___, Pl. App. ___" refers to the exhibits and the reference pages of the separately bound Appendix in support of Plaintiff's Motion and Memorandum dated May 11, 1998; (7) "Def. App. ____" refers to the reference pages from Defendant's Appendices; (8) "1985 Contract §____" refers to the FEHB Program Contract that was effective, subject to annual renewals, from January 1, 1985 through December 31, 1990; and (9) "1991 Contract §____" refers to the FEHB Program Contract that was effective, subject to annual renewals, from January 1, 1991 through December 31, 1994.

2 5 U.S.C. §§ 8901 *et seq.*; *see also* Def. Motion at 4; Complaint/Answer at ¶ 8.

19. During the claim period, HIP-NY was contractually obligated and had the contractual right to rely upon the enrollment data provided by Defendant.[23]

20. The enrollment data determines the premiums due HIP-NY for each payroll period covered by the claim.[24]

21. In 1991, OPM revised the FEHB Contract to require, for the first time, that Defendant and HIP-NY "reconcile" their enrollment records annually.[25] The contract required Defendant to provide the carriers enrollment records and carriers were to "reconcile its enrollment records with those provided by the Government."[26] Since at least 1991, HIP-NY annually reconciled its enrollment records with the records provided by Defendant.[27]

**E. Payments**

22. During the claim period, HIP-NY received payments twice a month from OPM by wire transfer in payment of premiums due under the FEHB Program.[28]

23. During the claim period, OPM did not allocate any portion of a particular payment to a particular payroll office making the payment or for the benefit of any particular enrollee.[29]

---

23 1985 Contract § 3.3 (Ex. 1, Pl. App. 7); 1991 Contract § 1.5 (Ex. 2, Pl. App. 15); Dep. Block at 193/1-9 (Ex. 5, Pl. App. 35).

24 Complaint/Answer at ¶ 28.

25 1991 Contract §1.5 (Ex. 2, Pl. App. 15); Def. Motion at 13. The 1985 contract did not mandate this reconciliation process.

26 Id.

27 Declaration of William Mulryan ("Mulryan Decl.") at ¶¶ 3-4 (Ex. 4, Pl. App. 28-29); HIP-NY Sample Reconciliation Correspondence (Ex. 12, Pl. App. 99-112).

28 Complaint/Answer at ¶ 32; see also Def. Motion at 5, 7.

29 Complaint/Answer at ¶ 32.

30. OPM did not respond to the administrative claim for underpayment within the sixty days required under the contract and applicable statute and regulations. Accordingly, OPM rejected the claim due to lapse of time.[36]

31. HIP-NY exhausted all of its administrative remedies prior to filing this lawsuit.[37]

**G. Underpayments**

32. Defendant has admitted that it has consistently underpaid FEHB Program community-rated carriers, which includes HIP-NY, the full amount of premiums due under the FEHB Program.[38]

33. Defendant was obligated to pay the full premium for each subscriber enrolled in the HIP-NY plan at the negotiated rates during the claim period.[39] Defendant admits it is obligated to pay all underpayments of the premiums due for all enrollees enrolled in HIP-NY's plan during the claim period.[40]

Respectfully submitted,

Dated: May 11, 1998

JEFFREY W. KING, ESQ.
KING, PAGANO & HARRISON
1730 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 371-6800

Attorneys for Plaintiff,
Health Insurance Plan of Greater New York

---

36 Complaint/Answer at ¶ 32.

37 Complaint at ¶ 44.

38 Dep. Block at 83/15-17, 248/21-249/2 (Ex. 5, Pl. App. 33, 36); Dep. Titus at 30/5-8, 88/21-89/3, 209/3-12 (Ex. 7, Pl. App. 45-47, 49); Dep. Ray at 115/3-19, 202/8-14 (Ex. 8, App. 51-52); Dep. Lewis at 49/11-20, 203/15-204/4 (Ex. 6, App. 39, 40-41); Dep. Jansen at 165/9-14, 166/1-12, 209/10-18 (Ex. 9, App. 54-56).

39 1985 Contract § 1.2, 3.1 (Ex. 1, Pl. App. 3, 5); 1991 Contract Signature Page and § 3.1 (Ex. 2, Pl. App. 10, 18); see also Def. Motion at 12, n. 16; Dep. Block at 193/10-15 (Ex. 5, Pl. App. 35).

40 Def. Motion at 12, n. 16; see also Dep. Block at 193/10-15 (Ex. 5, Pl. App. 35).

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that I caused one copy of *PLAINTIFF'S* PROPOSED FINDINGS OF UNCONTROVERTED FACTS to be served, via first class mail, postage prepaid, this 11th day of May, 1998, upon the following individual:

John E. Kosloske
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
Room 8012
1100 L Street, N.W.
Washington, D.C. 20530

Christopher Flynn

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC., | ) | |
| Plaintiff, | ) | No. 97-187C |
| v. | ) | (Judge Merow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S STATEMENT OF GENUINE ISSUES

Pursuant to RCFC 56(d)(2), defendant, the United States, responds to "Plaintiff's Proposed Statement of Facts" dated May 11, 1998, as follows:[1]

1. Admits.

2. The allegations contained in paragraph 2 are conclusions of law to which no response is required; to the extent that they may be deemed allegations of fact, they are denied, except to admit that OPM is charged with the responsibility for administering the Federal Employees Health Benefits Act (FEHB Act),

[1] In this document, "Answer ¶ ____" refers to the referenced paragraphs of "Defendant's Answer" dated June 30, 1997; "Pl. App. ____" refers to the referenced page(s) of the "Appendix to Plaintiff's Memorandum of Law in Support of its Motion for Partial Summary Judgment on Counts I and II and in Opposition to Defendant's Motion to Dismiss in Part or, in the Alternative, for Summary Judgment" dated May 11, 1998; "Def. App. ____" refers to the referenced page(s) of the separately-bound, three-volume appendix dated April 10, 1998, filed in support of "Defendant's Motion to Dismiss in Part or, in the Alternative, for Partial Summary Judgment" dated April 10, 1998; and "Def. Supp. App. ____" refers to the referenced page(s) of the supplemental appendix accompanying "Defendant's Opposition to Plaintiff's Cross Motion for Partial Summary Judgment and Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Partial Summary Judgment" dated June 11, 1998."

18. The allegation contained in paragraph 18 is a conclusion of law to which no response is required.

19. The allegations contained in paragraph 19 are conclusions of law to which no response is required.

20. The allegation contained in paragraph 20 is a conclusion of law to which no response is required.

21. The allegations contained in the first and second sentences of paragraph 21 are conclusions of law to which not response is required; admits the allegations contained in the third sentence of paragraph 21.

22. Admits.

23. Denies the allegations contained in paragraph 23, except to admit that, upon a quarterly basis, OPM provided plaintiff with a report during the claim period that set forth the amount paid by each employing agency, but which did not identify the particular enrollee(s) upon whose behalf those payments were made. See Answer ¶ 32.

24. Admits.

25. Admits.

26. The allegation contained in paragraph 26 is a conclusion of law to which no response is required.

27. Denies the allegations contained in paragraph 27, except to admit that in May and June of 1996, plaintiff sent letters to more than one employing agency or payroll office in which plaintiff complained that the employing agencies and payroll offices contacted had not provided plaintiff with name lists within

I, § 1.5(b),(c), Def. App. 184. These provisions dovetail with FEHB regulations which, as noted above, provide that whenever an agency "determines" that it has made an underpayment of premiums into the Employees Health Benefits Fund, it must make a corrective payment into the Fund within 60 days of that determination. 5 C.F.R. § 890.502(e) (1994).

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

David M. Cohen

DAVID M. COHEN
Director

John Kosloske

OF COUNSEL:

PAUL BRITNER, ESQ.
Office of General Counsel
Office of Personnel Management
Washington, D.C. 20410

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

JUNE 11, 1996

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 11th day of JUNE, 1998, I caused to be sent by United States mail (postage prepaid) a copy of "DEFENDANT'S STATEMENT OF GENUINE ISSUES" addressed as follows:

JEFFREY W. KING, ESQ.
King, Pagano & Harrison
1730 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20006

J. E. Phillips